1
2
3
4
5
6
7
8
9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10   DARREN MICHAEL BRIN,                    CASE NO. C24-1019JLR

11                      Plaintiff,           ORDER

           v.
12
     JOSHUA HARTWICK, et al.,
13
                       Defendants.
14

15                          I.      INTRODUCTION

16         Before the court are *pro se* Plaintiff Darren Michael Brin and Defendants Sergeant

17   Joshua Hartwick, Officer Felicia Espana, Officer James Jordal, and Officer Keith

18   Polzin's (collectively, "Defendants") cross motions for summary judgment.  (Brin MSJ

19   (Dkt. # 29); Brin Reply (Dkt. # 50); Defs. MSJ (Dkt. # 48); Defs. Reply (Dkt. # 54).)

20   Both motions are opposed.  (*See* Defs. Resp. (Dkt. # 49); Brin Resp. (Dkt. # 51).)  The

21   court has considered the parties' motions, the relevant portions of the record, and the

22

1   applicable law.  Being fully advised,[1] the court DENIES Mr. Brin's motion for summary

2   judgment and GRANTS in part and DENIES in part Defendants' motion for summary

3   judgment.

## II.     BACKGROUND

4

5       Before considering the merits of the parties' motions, the court first provides the

6   relevant factual and procedural background.

7   **A.     Factual Background**

8       This case arises out Defendants' alleged unlawful detention and search of Mr.

9   Brin.  (Am. Compl. (Dkt. # 26).)  On February 23, 2023, Mr. Brin was staying at Lisa

10  Ogier's[2] apartment while she was away.  (7/7/25 Brin Decl. (Dkt. # 50-1) ¶ 7.)

11  In the late evening of February 23, 2023, James Dykstra[3] called 911 to report an alleged

12  hit-and-run collision by the driver of a white Nissan.  (Nedderman Decl. (Dkt. # 46) ¶ 4,

13  Ex. (Dkt. # 46-1) at 4[4] ("Police Records").)[5]  Mr. Dykstra told the dispatcher that the

14

15       [1] The parties did not request oral argument (*see* Brin MSJ at 1; Defs. MSJ at 1), and the
16  court concludes that oral argument is not necessary to its disposition of the parties' arguments.
    *See* Local Rules W.D. Wash. LCR 7(b)(4).

17       [2] Ms. Ogier is not a party in this action.

         [3] Mr. Dykstra is a not a party in this action.

18       [4] When citing to exhibits, the court refers to the CM/ECF page numbers at the top of the
    page.

19       [5] Both Mr. Brin and Defendants rely on the Police Records and the police narratives
20  therein to support their respective motions, and neither party disputes the authenticity of these
    records.  (*See* Nedderman Decl. Ex.; 6/10/25 Brin Decl. (Dkt. # 42) ¶ 4, Ex. E (Dkt. # 35) at
21  1-22; Brin Exhibit List (Dkt. # 30) at 4.)  The court cites the Police Records submitted by
    Defendants in the background section of this order because Mr. Brin has heavily marked on the
    records he filed.  (*See* 6/10/25 Brin Decl., Ex. E (Dkt. # 35).)  Because the hearsay statements in
22  the police narratives could be presented in an admissible form at trial—live testimony by

1    driver was a white male in his 40s, approximately 5'8" tall, and wearing a beanie hat, and

2    that the driver was walking away from the Nissan.  (Police Records at 4; Polzin Decl.

3    (Dkt. # 47) ¶ 1, Ex. 1 ("Polzin Report") at 1.)

4        At approximately 11:35 p.m., Defendants were dispatched to an apartment

5    complex where Mr. Dykstra and the Nissan were located.[6] (*See id.* at 4; *see* Polzin Report

6    at 2.)  This also happened to be the apartment complex where Mr. Brin was staying.

7    Officer Espana provided Mr. Dykstra's description of the driver of the Nissan to Officer

8    Polzin.  (Polzin Report at 1.)  After Officer Espana arrived at the scene, she located Mr.

9    Dykstra near the entrance of the apartment complex.  (Police Records at 4.)  Mr. Dykstra

10   told Officer Espana that the driver attempted to turn the wrong way on a ramp and nearly

11   hit Mr. Dykstra's vehicle.  (*Id.*)  Mr. Dykstra was concerned the driver was impaired, so

12   he followed the driver to the apartment complex to try to get the Nissan's license plate

13   number.  (*Id.*)

14       After Mr. Dykstra and the Nissan driver arrived at the apartment complex, they

15   got out of their vehicles.  (*Id.*)  However, Mr. Dykstra returned to his car and called 911

16   because the Nissan driver started yelling.  (*Id.*)  Mr. Dykstra told Officer Espana that,

17   while he was on the phone with the 911 dispatcher, the Nissan driver reversed his vehicle

18   and hit the front end of Mr. Dykstra's vehicle, then pulled forward in a possible attempt

19   _____

20   Defendants—the court may properly consider these narratives at the summary judgment stage.
     *See JL Beverage Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1110 (9th Cir. 2016).

21       [6] While it is undisputed that all Defendants were dispatched to and present at the scene by
     11:35 p.m., the Court acknowledges that the timing of each Defendants arrival cannot be
     established by the current record and is not relevant to resolving the issues presented by this

22   matter.  *See* Police Records at 4.

1  to drive away.  (*Id.* at 5.)  Mr. Dykstra also said that the collision caused damage to the

2  driver's side of the Nissan.  (*Id.*)

3        Sergeant Hartwick located the Nissan in a parking stall and observed an individual

4  walking away from the vehicle.  (Polzin Report at 1; *see* Police Records at 28 (Sergeant

5  Hartwick's call narrative); *see* 6/10/25 Brin Decl. ¶ 4.)  Sergeant Hartwick communicated

6  this information to Officer Polzin.  (Polzin Report at 1.)  Officer Polzin ran to Sergeant

7  Hartwick's location and noticed a male—who was later identified as Mr. Brin—walking

8  approximately 25 feet away from the Nissan.  (*Id.* at 2-3; Polzin Decl. ¶¶ 7-8.)  No one

9  else was around.  (Polzin Report at 2.)  Officer Polzin observed that Mr. Brin matched the

10  description Officer Espana provided to him—a white male in his 40s, approximately 5'8"

11  tall, and wearing a beanie hat.  (Polzin Report at 2; Polzin Decl. ¶ 6.)  Mr. Brin was

12  ordered to stop, and he complied with that order.  (6/10/25 Brin Decl. Ex. E (Dkt. # 37-2)

13  at 1-2 ("Defs. RFA Resp.").)  Officer Polzin told Mr. Brin that he was being detained.

14  (Polzin Decl. ¶ 5.)  At some point after Defendants stopped Mr. Brin, Officer Polzin

15  handcuffed him because Mr. Brin "refused to identify himself[,]" was "argumentative"

16  and "yelling[,]" and Officer Polzin did not know if he was armed.  (Polzin Decl. ¶ 9.)

17  Mr. Brin does not dispute he was argumentative; however, the parties disagree about the

18  extent to which Mr. Brin was argumentative and whether he refused to obey commands.

19  (*See id.*; Polzin Report at 1-2; 7/7/25 Brin Decl. (Dkt. # 50-1) ¶ 5 (stating that he

20  "initially declined to provide ID"); 6/10/25 Brin Decl., Ex. E (Dkt. # 35) at 12 (stating

21  that he was "argumentative" but that he answered Defendants' questions).)

22

1    At some point after Mr. Brin was detained, although it is not clear when, Mr.

2    Dykstra told Officer Espana that the Nissan driver had a "slender build" and was wearing

3    a "captain's hat" rather than a beanie.  (Police Records at 5.)  And after Mr. Brin was

4    detained, Officer Espana—via radio communication—requested a photo of Mr. Brin.

5    (Audio File (Dkt. # 34) at 7:00-7:06 (File "# 7" containing Defendants' audio

6    communications));[7] 6/10/25 Brin Decl. ¶ 4.)  After receiving the photo of Mr. Brin on her

7    phone, Officer Espana said over the radio:  "[reporting party] said that's not going to be

8    the guy, but I'm going to actually drive him there to do a field show up[.]"  (Audio File at

9    7:19-7:25.)  Officer Espana transported Mr. Dykstra to the area where Mr. Brin was

10   being detained for an in-person field show up.  (Police Records at 5; Polzin Report at 1

11   ("Officer Espana brought [Mr. Dykstra] to our location for a field show up"); Polzin

12   Decl. ¶ 10.)  At the in-person field show up, Mr. Dykstra stated that Mr. Brin was not the

13   Nissan driver.  (Polzin Decl. ¶ 10; Polzin Report at 2.)  According to Officer Polzin, he

14   released Mr. Brin at that time and told him he was free to go, although the parties

15   disagree about the length of his detention.  (Polzin Decl. ¶ 11; *see* Brin MSJ at 3; Defs.

16   Resp. at 2.)  After his release, Mr. Brin was observed walking into unit K203 of the

17   apartment complex.  (Police Records at 5.)

18

19        [7] Because Mr. Brin represents that he obtained the Audio File labeled "# 7" via a public
     records request (*see* 6/10/25 Brin Decl. ¶¶ 4-6), and because Defendants do not dispute the
20   authenticity of the Audio File (*see generally* Defs. Resp.), the court will consider the Audio File
     containing Defendants' communications in evaluating the parties' motions.  *See Amanuel v.*
21   *Soares*, No. 13-cv-05258 NC, 2015 WL 3523173, at *1 (N.D. Cal. June 3, 2015) (considering
     police audio recording at summary judgment stage).  The court will *not* consider the transcript of
22   the Audio File that Mr. Brin prepared (*see* Dkt. # 34), as that transcript has not been properly
     authenticated.

1    After Mr. Brin was detained and released, Officer Espana accessed the

2  Department of Licensing ("DOL") records for the Nissan, which showed that the Nissan

3  was recently sold to an individual named Jason Kempton.[8]  (Police Records at 4.)  Officer

4  Espana found information in a police database showing that Mr. Kempton was associated

5  with Mr. Brin.  (*Id.*; *see* Polzin Decl. ¶ 12.)  Officer Espana obtained Mr. Kempton's

6  DOL photo and showed it to Mr. Dykstra, who confirmed Mr. Kempton was the driver he

7  saw getting out of the Nissan and arguing with him.  (Police Records at 4.)  Because Mr.

8  Kempton was associated with Mr. Brin, officers knocked on the door of unit K203, but

9  no one answered the door.  (*Id.* at 4.)

10    Officer Espana completed a misdemeanor criminal citation for Mr. Kempton for

11  the alleged hit-and-run collision.  (*Id.* at 6; *see id.* at 16-17 (citation issued to Mr.

12  Kempton).)  The Nissan was impounded pending the application of a search warrant,

13  which was later authorized by Bothell Municipal Court Judge Mara J. Rozzano on

14  February 28, 2023, and executed by Officer Espana on March 3, 2023.  (*Id.* at 6.)[9]

15  Prosecutors initiated criminal proceedings against Mr. Kempton following the search of

16  the Nissan (*see* 6/10/25 Brin Decl., Ex. E (Dkt. # 35-5) at 12), but the case was ultimately

17

18

19    [8] Mr. Kempton is not a party in this action.

20    [9] The instant action concerns only Mr. Brin's alleged unlawful detainment on February
23, 2023; accordingly, the court does not consider Mr. Brin's allegations regarding events that
occurred *after* Mr. Brin was released—including Mr. Brin's claims regarding Defendants' search

21  of Mr. Kempton's Nissan, their investigation of Mr. Kempton and/or Ms. Ogier, or Mr. Brin's
post-February 2023 communications with the Washington Cities Insurance Authority claims

22  adjuster.  (*See* Brin MSJ at 2-5.)

1    dismissed "due to witness unavailability[,]" (*id.* at 13).  Mr. Brin was not involved in

2    these proceedings.

3    **B.    Procedural Background**

4        Mr. Brin commenced the instant action in King County Superior Court in April

5    2024 under 42 U.S.C. § 1983, alleging that Defendants violated his constitutional rights

6    by subjecting him to a false arrest.  (Compl. (Dkt. # 1-1) at 1-5.)  Defendants removed the

7    action to this court in July 2024.  (Removal Not. (Dkt. # 1) ¶¶ 5-9.)  Mr. Brin filed an

8    amended complaint on May 12, 2025.  (Am. Compl. (Dkt. # 26).)  The only claims

9    remaining before the court are Mr. Brin's Fourth Amendment unlawful detention claim,

10   his Fourth Amendment unlawful search claim, and his false imprisonment claim.  (*See id.*

11   at 4; 5/19/25 Order (Dkt. # 27) (authorizing Mr. Brin to proceed with those claims and

12   dismissing his other claims).)

13                        **III.    ANALYSIS**

14       Below, the court first discusses the legal standards governing the parties' summary

15   judgment motions.  Then, the court addresses a preliminary matter regarding Mr. Brin's

16   claims before finally turning to the merits of the parties' motions.

17   **A.    Legal Standards**

18       Summary judgment is appropriate if the evidence shows "that there is no genuine

19   dispute as to any material fact and the movant is entitled to judgment as a matter of law."

20   Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A fact

21   is "material" if it might affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*,

22   477 U.S. 242, 248 (1986).  A factual dispute is "'genuine' only if there is sufficient

1  evidence for a reasonable fact finder to find for" the nonmoving party.  *Far Out Prods.,*

2  *Inc. v. Oskar*, 247 F.3d 986, 992 (9th Cir. 2001) (citing *Anderson*, 477 U.S. at 248-49).

3  The court must "view[] the evidence in the light most favorable to the nonmoving

4  party[.]"  *Kaelin v. Globe Comm'ns Corp.*, 162 F.3d 1036, 1039 (9th Cir. 1998).  When

5  the parties have filed cross-motions for summary judgment, the court "evaluate[s] each

6  motion separately, giving the nonmoving party in each instance the benefit of all

7  reasonable inferences."  *ACLU v. City of Las Vegas*, 333 F.3d 1092, 1097 (9th Cir. 2003).

8       The moving party bears the initial burden of showing there is no genuine dispute

9  of material fact and that it is entitled to prevail as a matter of law.  *Celotex*, 477 U.S. at

10  323.  The burden then shifts to the nonmoving party to identify specific facts from which

11  a factfinder could reasonably find in the nonmoving party's favor.  *Id.* at 324; *Anderson*,

12  477 U.S. at 250.  To defeat a summary judgment motion, the nonmoving party "must

13  present significant probative evidence tending to support its claim or defense."  *Intel*

14  *Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991).  Thus, the

15  nonmovant must show that there are "genuine factual issues that properly can be resolved

16  only by a finder of fact because they may reasonably be resolved in favor of either party."

17  *Anderson*, 477 U.S. at 250.

18  **B.  Preliminary Matter**

19       Having considered the parties' motions, it is necessary for the court to clarify

20  which of Mr. Brin's claims are before the court.  On May 19, 2025, the court held that

21  Mr. Brin's amended complaint sufficiently stated, and Mr. Brin was therefore permitted

22  to proceed with, his claims for (1) Fourth Amendment unlawful detention; (2) Fourth

1    Amendment unlawful search; and (3) false imprisonment.  (*See* 5/19/25 Order (Dkt. # 27)

2    at 7; *see id.* at 1-2); Am. Compl. (Dkt. # 26).)  The court dismissed Mr. Brin's claims

3    under § 1985(3) and § 1986 with prejudice for failure to state a claim, and dismissed his

4    claims for "false reporting," emotional distress, and Eighth Amendment violations as

5    untimely because he failed to demonstrate good cause to add these claims during the late

6    stages of litigation.  (*Id.* at 6-8.)

7        In his instant motion, Mr. Brin seeks summary judgment not only with respect to

8    his claims for Fourth Amendment unlawful detention, Fourth Amendment unlawful

9    search, and false imprisonment, but also claims for "fabricated arrest" with respect to Mr.

10   Kempton; "suppression of evidence [in] violat[ion of] due process;" "Washington Cities

11   Insurance Authority ["WCIA"] claim denial" in connection with a WCIA claim he filed

12   in July 2023; a municipal liability claim; a § 1985(3) claim alleging a "coordinated effort

13   to suppress material evidence" and "falsify the investigative timeline;" claims for

14   "post-clearance retaliation;" claims for "violations of sworn Oath of Office and the Police

15   Officer's Code of Ethics" and "official misconduct;" a claim against Sergeant Hartwick

16   for "false [im]personation of a public officer;" and a "renewed" claim for emotional

17   distress or post-traumatic stress.  (*See* Brin MSJ at 8-12, 14-16 (cleaned up); Brin Reply

18   at 3, 16.)

19       Each of these claims were either dismissed by previous orders of the court or were

20   not alleged in Mr. Brin's operative amended complaint.  And Mr. Brin did not seek leave

21   to amend his complaint to add these claims after the court's May 19, 2025 order was

22   entered.  (*See* 5/19/25 Order; *see generally* Dkt.)  It is settled law in the Ninth Circuit that

1  parties cannot assert claims for the first time at the summary judgment stage. *See Navajo*

2  *Nation v. United States Forest Serv.*, 535 F.3d 1058, 1080 (9th Cir. 2008). Accordingly,

3  the court will not consider these claims in this action.

4  **C.    Mr. Brin's Summary Judgment Motion**

5       Mr. Brin argues that he is entitled to summary judgment with respect to his Fourth

6  Amendment unlawful detention claim, his Fourth Amendment unlawful search claim, and

7  his false imprisonment claim. (*See* Brin MSJ at 6-11.) To sustain a § 1983 action, a

8  plaintiff must show that (1) the conduct complained of was committed by an individual

9  acting under color of state law; and (2) the conduct deprived the plaintiff of a federal

10 constitutional or statutory right. *Wood v. Ostrander,* 879 F.2d 583, 587 (9th Cir. 1989).

11 Defendants do not dispute that they were acting under color of law at all times relevant to

12 this action. (Defs. Resp. at 8.) Defendants also did not raise a qualified immunity

13 defense in this action. (*See* Defs. Reply at 2.) Accordingly, the issue before the court is

14 whether Defendants violated Mr. Brin's rights. The court addresses the parties'

15 arguments with respect to each of Mr. Brin's claims in turn.

16       1.   Fourth Amendment Unlawful Detention Claim

17       The Fourth Amendment applies to all seizures of the person, including arrests and

18 seizures that involve only a brief detention, such as an investigatory or "*Terry*" stop.

19 *United States v. Arvizu*, 534 U.S. 266, 273 (2002); *see Terry v. Ohio*, 392 U.S. 1 (1968).

20 Mr. Brin argues that his detention was unlawful regardless of whether it constituted an

21 investigatory stop or an arrest. (*See* Brin MSJ at 6; Brin Reply at 10.) Specifically, he

22 argues that Defendants lacked reasonable suspicion or probable cause to detain him in the

first instance because (1) Mr. Dykstra's vehicle was not damaged in the alleged

hit-and-run collision; (2) Defendants knew that the Nissan was recently sold to Mr.

Kempton before detaining Mr. Brin; and (3) Defendants did not obtain Mr. Kempton's

DOL picture before detaining Mr. Brin. (Brin MSJ at 2, 4-5.)[10] Defendants argue that

Mr. Brin's detention constituted a lawful investigatory stop. (*See* Defs. Resp. at 9.)

Mr. Brin also asserts that his detention exceeded the scope of an investigatory stop

and became an unlawful arrest. (*See* Brin MSJ at 15; Brin Reply at 10.) He further

challenges the duration of his detention, arguing that Defendants kept Mr. Brin detained

even after Mr. Dykstra—in Mr. Brin's view—"exonerated" him. (*See* Brin MSJ at 4.)

Defendants deny that Mr. Brin was arrested, but they assert that his detention was lawful

even if it amounted to an arrest. (Defs. Resp. at 9.) The court examines the parties'

arguments with respect to Mr. Brin's initial detention and the duration of his detention

below.

### a. *Defendants' Initial Decision to Stop Mr. Brin*

The court begins by examining Mr. Brin's argument regarding the lawfulness of

Defendants' decision to stop him in the first instance.[11] The court understands Mr. Brin

to argue that Defendants lacked reasonable suspicion to stop him. (*See* Brin MSJ at 6.)

---

[10] Mr. Brin also argues his detention lacked probable cause because a judge in Mr. Kempton's criminal case entered an order finding "no probable cause" in Mr. Kempton's criminal case on March 8, 2023. (Brin MSJ at 8 (citing Ex. E (Dkt. # 35-5) at 12).) But Mr. Brin was not involved in Mr. Kempton's criminal case, and that order has no bearing on whether Defendants had the requisite legal justification to detain Mr. Brin on February 23, 2023.

[11] For purposes of resolving whether Defendants had the requisite reasonable suspicion or probable cause to lawfully detain Mr. Brin, the court considers their knowledge collectively,

1    Law enforcement officers generally need probable cause to seize a person;

2    however, "there exists a limited exception for brief investigatory stops[.]" *Sialoi v. City*

3    *of San Diego*, 823 F.3d 1223, 1232, 1235 (9th Cir. 2016) (citing *Terry v. Ohio*, 392 U.S.

4    1 (1986)).  To justify an investigatory stop, an officer must have "reasonable suspicion"

5    to believe that criminal activity is afoot.  *Id.*  The reasonable suspicion standard is "a less

6    demanding standard than probable cause" and "merely requires a minimal level of

7    objective justification." *Gallegos v. City of Los Angeles*, 308 F.3d 987, 990 (9th Cir.

8    2002) (cleaned up and citation omitted).  Specifically, an officer must have, in light of the

9    totality of the circumstances, "a particularized and objective basis for suspecting the

10   particular person stopped of criminal activity[,]" *United States v. Basher*, 629 F.3d 1161,

11   1165 (9th Cir. 2011), rather than just a "hunch of criminal activity[,]" *United States v.*

12   *Montero-Camargo*, 208 F.3d 1122, 1129 (9th Cir. 2000) (cleaned up).  In determining

13   whether an officer had reasonable suspicion to conduct an investigatory stop, the court

14   considers "the facts available to the officer at the moment of seizure." *United States v.*

15   *Smith*, 217 F.3d 746, 749 (9th Cir. 2000).

16   The court can readily determine that Defendants' initial decision to stop Mr. Brin

17   to conduct an investigatory detention was supported by reasonable suspicion.  The

18   undisputed evidence shows that the dispatcher informed Officer Espana—who then

19   informed Officer Polzin—that Mr. Dykstra described the Nissan driver as a white male in

20   his 40s, approximately 5'8" tall, wearing a beanie hat, and that the driver was walking

21   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

22   even if specific facts known to one Defendant were not known to the other Defendants.  *See*
     *United States v. Ramirez*, 473 F.3d 1026, 1032-33 (9th Cir. 2007)*.*

ORDER - 12

away from the Nissan.  (Police Report at 4; *see also* Polzin Report at 1.)  Within minutes

after the alleged hit-and-run collision occurred, Sergeant Hartwick and Officer Polzin

saw an individual (who was later identified as Mr. Brin) approximately 25 feet from the

Nissan, while nobody else was around.  (Polzin Report at 1.)  Officer Polzin observed

that the individual generally matched Mr. Dykstra's original description of the driver.

(*See id.*)  Mr. Brin does not dispute that he generally matched Mr. Dykstra's original

description of the driver.  (*See generally* Brin MSJ; Brin Reply.)[12]  And although Mr.

Brin appears to argue that he does not match the *modified* description of the driver that

Mr. Dykstra provided (i.e., "slender" and wearing a "captain's hat") (*see* Brin MSJ at 3),

Mr. Brin does not dispute that Mr. Dykstra provided this modified description to Officer

Espana *after* Mr. Brin was detained.  (*See* Police Records at 4; *see generally* Brin MSJ;

Brin Reply.)  There is thus no reasonable dispute that, "at the moment of" Mr. Brin's

initial detention, Defendants had reasonable suspicion to detain him to conduct an

investigatory stop.  *See Smith*, 217 F.3d at 749.

The court can easily dispose of Mr. Brin's remaining arguments asserting that his

initial detention was unlawful.  First, Mr. Brin argues that Defendants lacked reasonable

suspicion to detain him for committing the alleged hit-and-run collision because Mr.

Dykstra's vehicle was not damaged.  Therefore, in Mr. Brin's view, there was "no crime"

to justify his detention.  (*See* Brin MSJ at 2, 4; Brin Reply at 6 n.4, 10.)  But Mr. Brin

---

[12] To the extent Mr. Brin argues that Defendants lacked reasonable suspicion because Mr. does not *exactly* match Mr. Dykstra's original description (*see* Brin MSJ at 2 (stating that he is 6'1" tall)), a suspect need not be an exact match to support reasonable suspicion.  *See Alexander v. Cnty. of Los Angeles*, 64 F.3d 1315, 1319 (9th Cir. 1995).

1    does not dispute that the Nissan driver hit Mr. Dykstra's vehicle, that Mr. Dykstra

2    reported that the driver was leaving the scene of the collision, and that Defendants

3    observed damage to the Nissan after the alleged hit-and-run collision.  (*See generally*

4    Brin MSJ; Brin Reply.)  Mr. Brin has not provided—and the court cannot locate—any

5    legal authority showing he is entitled to judgment as a matter of law on this basis.

6        Second, Mr. Brin argues that his detention was unlawful because Defendants "had

7    prior knowledge" that the Nissan was "recently sold" to Mr. Kempton before they

8    detained Mr. Brin, but they "failed to verify [Mr. Brin's] identify against DOL records."

9    (Brin MSJ at 13; *see* Audio File at 6:10-6:15 (noting that the vehicle was sold to Mr.

10   Kempton).)  The court understands Mr. Brin to argue that, had Defendants verified Mr.

11   Brin's identity, they would have known he was not the driver because Mr. Brin "b[ears]

12   no resemblance to" Mr. Kempton.  (*Id.*)  Mr. Brin, however, does not dispute that he

13   refused to identify himself at the time he was initially stopped and before he was

14   handcuffed.  (7/7/25 Brin Decl. ¶ 5 (stating that he "initially declined to provide ID" but

15   then offered to do so after he was handcuffed).)  Therefore, Defendants could not verify

16   Mr. Brin's identity prior to detaining him.  Setting that aside, the fact that the Nissan was

17   recently *sold* to Mr. Kempton has no bearing on whether Defendants had reasonable

18   suspicion to believe Mr. Brin was *driving* the Nissan at the time of the collision.

19   Accordingly, Mr. Brin is not entitled to judgment as a matter of law on this basis.

20       Third, Mr. Brin appears to argue that Defendants could have identified the Nissan

21   driver sooner had they obtained Mr. Kempton's DOL picture before detaining Mr. Brin.

22   (Brin MSJ at 2, 5.)  The court understands Mr. Brin to argue that, if Defendants obtained

ORDER - 14

1   Mr. Kempton's DOL picture earlier, Mr. Dykstra could have identified the Nissan driver

2   before Mr. Brin was detained.  But "[t]he argument that there were other ways that

3   [Defendants] could have proceeded" to identify a suspect "misses the point."  *See*

4   *Gallegos*, 308 F.3d at 992.  Indeed, the Fourth Amendment "does not mandate one and

5   only one way for police to confirm the identity of a suspect."  *Id.* (emphasis in original).

6   Therefore, Defendants' failure to obtain Mr. Kempton's DOL picture prior to detaining

7   Mr. Brin did not violate his Fourth Amendment rights.

8          In light of the foregoing, the court concludes as a matter of law that Defendants'

9   initial decision to detain Mr. Brin to conduct an investigatory stop was supported by

10  reasonable suspicion.  The court therefore denies Mr. Brin's motion for summary

11  judgment with respect to his Fourth Amendment unlawful detention claim to the extent

12  that it is based on Defendants' initial decision to stop him.

13              *b.  Whether the Investigatory Stop Became a De Facto Arrest*

14         Whether an encounter between law enforcement officers and a detained individual

15  remains an investigatory stop or amounts to an arrest is a mixed question of law and fact.

16  *United States v. Cormier*, 220 F.3d 1103, 1110 (9th Cir. 2000).  An arrest requires

17  probable cause, which "exists when officers have knowledge or reasonably trustworthy

18  information sufficient to lead a person of reasonable caution to believe that an offense has

19  been committed" by the suspected person.  *United States v. Lopez*, 482 F.3d 1067, 1072

20  (9th Cir. 2007).  Probable cause exists when, under the "totality of facts" available to

21  officers at the time of arrest "there is a fair probability or substantial chance of criminal

22

1  activity." *United States v. Patayan Soriano,* 361 F.3d 494, 505 (9th Cir. 2004) (citation

2  omitted).

3      The Ninth Circuit has not provided a bright line rule to determine when an

4  investigatory stop becomes a *de facto* arrest requiring probable cause. *Gallegos*, 308

5  F.3d at 991. Rather, courts evaluate whether "a reasonable person would believe that he

6  [or she] is being subjected to more than a temporary detention," *United States v. Brown*,

7  996 F.3d 998, 1006 (9th Cir. 2021) (alteration in original), as well as the "intrusiveness of

8  the stop and whether the methods used [by the officers] were reasonable *given the*

9  *specific circumstances*[,]" *Washington v. Lambert*, 98 F.3d 1181, 1186 (9th Cir. 1996)

10  (emphasis in original)).

11      Notably, handcuffing an individual "substantially aggravates the intrusiveness" of,

12  and is not a typically part of, an investigatory stop. *Reynaga Hernandez v. Skinner*, 969

13  F.3d 930, 941 (9th Cir. 2020) (citation omitted); *see also United States v. Bravo*, 295

14  F.3d 1002, 1010 (9th Cir. 2002) (noting that "handcuffing is a substantial factor in

15  determining whether an individual has been arrested"). However, "[t]he whole point of

16  an investigatory stop, as the name suggests, is to allow [law enforcement officers] to

17  *investigate*, . . . [and] to make sure that they have the right person." *Gallegos*, 308 F.3d

18  at 991 (emphasis in original). Accordingly, Ninth Circuit law permits officers to use

19  intrusive means such as handcuffing to effect an investigatory stop—without escalating

20  the stop into an arrest—in special circumstances, including:

21          1) where the suspect is uncooperative or takes action at the scene that raises
              a reasonable possibility of danger or flight; 2) where the police have
22          information that the suspect is currently armed; 3) where the stop closely

1   follows a violent crime; and 4) where the police have information that a
2   crime that may involve violence is about to occur.

*Johnson v. Bay Area Rapid Transit Dist.*, 724 F.3d 1159, 1176 (9th Cir. 2013) (cleaned

up and quoting *Lambert*, 98 F.3d at 1189). In addition to those four circumstances, as

relevant here, the court may also consider, 5) the specificity of the information leading

the officers to suspect that the individual is the actual suspect, and 6) the presence of

other officers on the scene at the time of the detention. *Lambert*, 98 F.3d at 1189-90.

Here, there is no evidence to support the second, third, or fourth circumstances.

Indeed, there is no evidence that Defendants had information that Mr. Brin was armed, or

believed they were responding to reports of a violent crime or that a crime of violence

was about to occur. (*See generally* Brin MSJ; Defs. Resp.); *see Johnson*, 724 F.3d at

1177 ("not knowing whether a suspect is armed is not the same as having reason to

believe the suspect is actually armed"). As to the sixth circumstance, it is undisputed that

Officer Polzin arrested Mr. Brin, and the court understands that Sergeant Hartwick was

present at that time, although it is unclear how many other officers were present at that

time. (*See* Polzin Report at 1.) As to the fifth circumstance, Defendants had specific

information—namely, Mr. Dykstra's original description of the driver—leading them to

believe that Mr. Brin was the suspect. (*See generally* Brin MSJ; Brin Reply; *see* Defs.

Resp. at 10, 11 (arguing that Defendants had specific information leading them to believe

that Mr. Brin was the suspect).) Rather, the parties' dispute centers on whether and to

what extent the first circumstance is present here. (*See generally* Brin MSJ; Defs. Resp.)

1      By Mr. Brin's account, he "complied with all instructions" and did not "resist"

2   Defendants' orders, including Defendants' initial order to stop.  (Brin MSJ at 2.)  He

3   asserts that he answered all questions, including explaining why he was outside and

4   where he lived.  (*See* Brin MSJ at 6; Brin Reply at 9; 7/7/25 Brin Decl. ¶ 10 (stating that

5   the facts alleged in his reply brief are accurate); 6/10/25 Brin Decl., Ex. E (Dkt. # 35) at

6   5, 12.)  Mr. Brin does not dispute he was "argumentative" during the encounter (6/10/25

7   Brin Decl., Ex. E (Dkt. # 35)), but contends that he spoke "calmly" to Defendants (Brin

8   MSJ at 6).  Mr. Brin also does not dispute that he refused to identify himself initially, but

9   states that he offered to get his ID *after* he was detained.  (7/7/25 Brin Decl. ¶ 5.)

10     Although Defendants do not dispute that Mr. Brin complied with their initial order

11   to stop (*see* Defs. RFA Resp. (admitting that Mr. Brin "complied with an order to stop")),

12   they contend that Mr. Brin not only refused to identify himself, but also refused to answer

13   their questions regarding where he lived or why he was outside.  (Polzin Report at 1.)

14   They also assert Mr. Brin was "argumentative," "yelling" about his rights, and continued

15   arguing and yelling throughout the encounter despite Officer Polzin's attempts to explain

16   what was happening.  (*See id.*; Polzin Decl. ¶ 9.)  Mr. Polzin states that he handcuffed

17   Mr. Brin for "cautionary purposes" and for "safety[,]" although the record does not show

18   the extent to which Mr. Brin was argumentative or what he said during that period.

19   (Polzin Decl. ¶ 9.)

20     Mr. Brin argues that his detention was unlawful because his "verbal protests" of

21   alleged police misconduct "cannot justify [the use of] force or seizure."  (Brin MSJ at 6;

22   Brin Reply at 9 (citing *Duran v. City of Douglas*, 904 F.2d 1372 (9th Cir. 1990);

1   *Mackinney v. Nielsen*, 69 F.3d 1002 (9th Cir. 1995)).)[13]  Mr. Brin is correct that an

2   individual's verbal protests of police conduct cannot *alone* justify an officer's decision to

3   stop or arrest an individual.  *See Duran*, 904 F.2d at 1378 (holding that police did not

4   have reasonable suspicion to stop an individual for suspected criminal activity based on

5   obscene gestures he directed at police); *Mackinney*, 69 F.3d at 1006-07 (holding that

6   police did not have probable cause to arrest plaintiff for verbal protest to police conduct).

7   However, these cases do not bear on whether an officer's use of handcuffs transforms an

8   investigatory stop into an arrest if the officer has reasonable suspicion to suspect an

9   individual committed a crime independent of his verbal protests, and if the suspect is

10  uncooperative.

11      Given the parties' varied accounts of Mr. Brin's alleged conduct during his

12  detention, the questions of whether and to what extent Mr. Brin was uncooperative is

13  based in part on the credibility of the parties' testimony.  The court cannot resolve such

14  questions at the summary judgment stage.  *See Earp v. Ornoski*, 431 F.3d 1158, 1170 (9th

15  Cir. 2005) ("Summary judgment is an inappropriate vehicle for resolving claims that

16  depend on credibility determinations."); *see also Loharsingh v. City & Cnty. of San

17  Francisco*, 696 F. Supp. 2d 1080, 1098 (N.D. Cal. 2010) ("While certain police actions

18  will constitute an arrest in some circumstances, such as where the suspects are

19

20      [13] Mr. Brin also cited *Ford v. City of Yakima*, 706 F.3d 1188 (9th Cir. 2013) for this
21  proposition.  (Brin MSJ at 6.)  *Ford* involved a First Amendment retaliatory arrest claim, and
    was abrogated by *Nieves v. Bartlett*, 587 U.S. 391, 403-04 (2019), on the basis that a plaintiff
    must prove the absence of probable cause for an arrest to establish a retaliatory arrest claim.
22  Because Mr. Brin did not plead a retaliatory arrest claim, *Ford* does not apply here.

1    cooperative, those same actions may not constitute an arrest where the suspect is

2    uncooperative[.]").

3         In reviewing the evidence in the light most favorable to Defendants, a reasonable

4    jury could conclude that Mr. Brin was sufficiently uncooperative, and that Defendants'

5    use of handcuffs therefore did not transform his investigatory stop into an arrest.  *See*

6    *Johnson*, 724 F.3d at 1177-78 (holding that whether officer's use of force was reasonable

7    and whether stop became a *de facto* arrest "must be resolved by a jury"); *Garza v. City of*

8    *Salem*, 690 F. Supp. 3d 1188, 1201 (D. Or. 2023) (holding that plaintiff's detention did

9    not amount to arrest when the plaintiff was "uncooperative and yelling" at the officer).

10   Accordingly, there are triable questions of fact bearing on the question of whether

11   Defendants' use of handcuffs transformed Mr. Brin's investigatory stop into an arrest that

12   was supported by probable cause.

13              *c.  Whether Mr. Brin's Detention Was Unlawfully Prolonged*

14        Mr. Brin asserts that Defendants unlawfully prolonged his detention at least ten

15   minutes beyond the time they learned that he was not the Nissan driver.  (*See* Brin Reply

16   at 6, 8; *see* Brin MSJ at 2, 13.)  In his view, Mr. Dykstra "exonerated" Mr. Brin after

17   seeing Mr. Brin's picture—before the in-person field show up.  (Brin MSJ at 2, 4, 9; Brin

18   Reply at 7 (alleging there was a "10-minute delay[] between the remote photo rejection

19   and the in-person show up" (emphases omitted)).)  Defendants contend their investigation

20   did not exceed the scope of a valid investigatory stop.  (*See* Defs. Resp. at 2; *see id.* at 5.)

21        Detentions that are initially lawful may become unlawful if prolonged past the

22   point that law enforcement officers have legally sufficient justification for detaining the

individual.  *See Davis v. United States*, 854 F.3d 594, 600 (9th Cir. 2017); *Brewster v. Beck*, 859 F.3d 1194, 1197 (9th Cir. 2017).  The standard applicable to the question of whether Defendants unlawfully prolonged Mr. Brin's detention depends on whether Mr. Brin's detention escalated from an investigatory stop to an arrest.

There is "no rigid time limitation" on investigatory stops.  *Gallegos*, 308 F.3d at 992 (quoting *Sharpe*, 470 U.S. at 685).  Rather, in determining whether an investigatory stop was unlawfully prolonged, courts consider whether law enforcement officers' actions "involve[d] any delay unnecessary to the[ir] legitimate investigation."  *Gallegos*, 308 F.3d at 992 (citation omitted).  The "critical inquiry is whether the officers diligently pursued a means or investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain" the individual.  *United States v. Torres-Sanchez*, 83 F.3d 1123, 1129 (9th Cir. 1996) (quoting *Sharpe*, 470 U.S. at 686).  Put another way, courts evaluate whether there was an "investigative purpose" for continuing to detain the individual.  *See Rayzberg v. Cty. of Los Angeles*, No. CV 23-2585-DMG (JCx), 2024 WL 3055474 (C.D. Cal. May 8, 2024).

Different legal standards apply in determining whether the duration of an arrest is unlawful.  Even if an arrest was initially supported by probable cause in the initial stages of the investigation, such probable cause "may be dissipated if the investigating officer later learns additional information that decreases the likelihood" that the arrested individual engaged in criminal activity.  *United States v. Ortiz-Hernandez*, 427 F.3d 567, 574 (9th Cir. 2005); *see also Sialoi*, 823 F.3d at 1232 (stating that information learned post-arrest "may indicate there is less than a fair probability" the individual committed a

1    crime).  Once "previously established probable cause has dissipated[,]" the arrested

2    person "must be released from arrest[.]"  *Nicholson v. City of Los Angeles*, 935 F.3d 685,

3    691 (9th Cir. 2019) (quoting *Ortiz-Hernandez*, 427 F.3d at 574).

4        Here, the audio recording of Defendants' communications shows that Officer

5    Espana requested a picture of Mr. Brin after he was detained.  (Audio File at 7:00-7:06.)

6    Shortly after receiving Mr. Brin's picture, Officer Espana communicated over the radio,

7    "RP [i.e., reporting party, Mr. Dykstra] says that's not going to be the guy, but I'm going

8    to actually drive [Mr. Dykstra] there to do a field show up[.]"  (*Id.* at 7:20.)  Shortly

9    thereafter, Officer Espana said that she was "on [her] way out[.]"  (*Id.* at 8:05.)  After

10   observing Mr. Brin at the in-person field show up,[14] Mr. Dykstra said that Mr. Brin was

11   not the Nissan driver.  (Police Records at 4; Polzin Report at 1.)  At that time, Officer

12   Polzin released Mr. Brin and told him that he was free to go.  (Polzin Report at 1.)

13   According to the audio recording, Mr. Brin was released from detention within minutes

14   after Officer Espana requested a picture of Mr. Brin.  (*See* Audio File at 7:00-9:19.)[15]

15

16       [14] Mr. Brin disputes how long it took Officer Espana to drive Mr. Dykstra to the field
     show up (*see* Brin MSJ at 3; Brin Reply at 7-8), but this dispute is not material to Mr. Brin's
17   Fourth Amendment claim.  The issue is whether Defendants' decision to continue to detain Mr.
     Brin to conduct the in-person field show had an investigatory purpose (or—if Mr. Brin was
18   arrested—whether Defendants had probable cause to continue to detain him at that time).

         [15] Mr. Brin appears to argue that his detention continued after the in-person field show
19   up.  (*See* Brin MSJ at 2.)  The court understands Mr. Brin to argue that his detention was
     unlawfully continued because officers knocked on his door in search of Mr. Kempton or Ms.
20   Ogier and ran "database searches" on Mr. Brin, Mr. Kempton, and Ms. Ogier, following Mr.
     Brin's release.  (*See* Brin MSJ at 2-3; Brin Reply at 13; 7/7/25 Brin Decl. ¶¶ 6-7, 9.)  Mr. Brin
21   has not provided any legal authority to support this theory.  Indeed, a detention falls within the
     ambit of the Fourth Amendment "[o]nly when the officer, by means of physical force or show of
22   authority, has in some way restrained the liberty of a citizen[.]"  *United States v. Faulkner*, 450

Given the various factual disputes in this matter—including when Defendants learned that Mr. Dykstra had modified his description of the driver, and the factual disputes bearing on the question of whether Mr. Brin's detention amounted to an arrest—the court cannot conclude as a matter of law whether or not Mr. Brin's detention amounted to an arrest and whether Defendants unlawfully prolonged Mr. Brin's detention. Accordingly, the court denies Mr. Brin's motion for summary judgment with respect to his Fourth Amendment claim to the extent it is based on the duration of his detention.

2. Fourth Amendment Unlawful Search Claim

Mr. Brin's briefing contains little argument regarding his Fourth Amendment unlawful search claim. (*See* Brin MSJ (arguing he was "searched without consent"); *see generally* Brin Reply.) He contends, however, that he was unlawfully "searched" and that Defendants "found [his] cell phone[,]" "which they took and placed on the landscaping rockery[.]" (Brin Reply at 9.) Defendants do not dispute these assertions and, instead, contend that their search was lawful and within the scope of an investigatory stop. (Defs. Resp. at 2, 7.)

Like his Fourth Amendment unlawful detention claim, the standards applicable to Mr. Brin's Fourth Amendment unlawful search claim differ depending on whether Mr. Brin was detained in an investigatory stop or an arrest at the time he was searched.

---

F.3d 466; *see id.* (stating that a "seizure" occurs within the meaning of the Fourth Amendment only if a "reasonable person would have believed that he was not free to leave"). Accordingly, the court does not consider these allegations in assessing Mr. Brin's claims.

1    In connection with an investigatory stop, an officer "may conduct a brief pat-down

2    (or frisk)" of an individual if that officer, based on the totality of the circumstances,

3    reasonably suspects the individual is armed and dangerous. *United Brown*, 996 F.3d at

4    1007-08 (9th Cir. 2021) (citing *Terry*, 392 U.S. at 24); *see id.* at 1010 (noting that the

5    officer must have "adequate cause" to conduct an investigatory search) (citation omitted).

6    Such a search must be "confined in scope to an intrusion reasonably designed" to

7    discover weapons. *Id.* at 1008.  A search following an investigatory stop is typically

8    limited to a pat-down of an individual's outer clothing and does not extend to an

9    individual's pockets unless the officer discovers an object during the pat-down that might

10   be a weapon. *Id.* at 1008-09 (citing *Terry*, 392 U.S. at 29-30).  However, *removing* items

11   from a suspect's pockets exceeds the scope of a permissible search following an

12   investigatory stop if the officer can readily determine the object is not a weapon. *See*

13   *United States v. Shepherd*, No. 2:24-cr-00083-DJC-1, 2024 WL 4931677, at *4 (E.D.

14   Cal. Dec. 2, 2024) (citing *Brown*, 996 F.3d at 1010); *United States v. Hoffman*, 762 F.

15   App'x 397, 400 (9th Cir. 2019) (holding that officer was justified in removing an object

16   from the plaintiff's pocket because, based on his initial pat-down, the officer "had not

17   yet ruled out [that object] as a weapon" (emphasis omitted)).

18    In contrast, a search incident to an arrest is not limited to a simple pat-down;

19   rather, the search may "involve a relatively extensive exploration" of the individual's

20   person, including the pockets of his or her clothing, so long as the officers had probable

21   cause to arrest the individual. *United States v. Williams*, 846 F.3d 303, 312 (9th Cir.

22   2016) (citations omitted).

1    Because there are genuine disputes of material fact that preclude the court from

2    determining whether Mr. Brin's detention was an investigatory stop or an arrest at the

3    time he was searched, as well as the extent of the search, the court cannot determine on

4    this record whether Defendants' search of Mr. Brin was lawful.  Accordingly, the court

5    denies Mr. Brin's motion for summary judgment with respect to his Fourth Amendment

6    unlawful search claim.

7        3.  <u>False Imprisonment</u>

8        Mr. Brin also asserts he is entitled to judgment as a matter of law with respect to

9    his false imprisonment claim because he was "detained without lawful justification[.]"

10   (Brin MSJ at 7.)  Defendants disagree.  (Defs. Resp. at 12-13.)

11       A claim for false imprisonment "is cognizable under § 1983 as a violation of the

12   Fourth Amendment provided that the arrest was made without probable cause or other

13   justification."  *See Carter v. Durkan*, No. C21-1046JLR, 2021 WL 6062628, at *4 (W.D.

14   Wash. Dec. 22, 2021) (citing cases).[16]  Therefore, to establish a § 1983 false

15   imprisonment claim, a plaintiff "must demonstrate that there was no probable cause to

16   arrest him."  *Cabrera v. City of Huntington Park*, 159 F.3d 374, 380 (9th Cir. 1998); *see*

17   *Youker v. Douglas Cnty.*, 258 P.3d 60, 68 (Wash. Ct. App. 2011).

18

19

20       [16] Mr. Brin pleaded a false imprisonment claim under § 1983 and state law.  (*See* Am.
Compl. at 4.)  The elements of a § 1983 and state law false imprisonment claims do not

21   substantively differ.  *See, e.g.*, *Youker v. Douglas Cnty.*, 258 P.3d 60, 68 (Wash. Ct. App. 2011)
(stating that false imprisonment occurs when a person "unlawfully restrains or imprisons another

22   person"); *id.* at 69 (noting that probable cause is a defense to a false imprisonment claim).)

1    Because material factual disputes exist regarding whether Mr. Brin's detention

2    remained an investigatory stop or amounted to an arrest, and in turn, whether Defendants

3    had the requisite reasonable suspicion or probable cause for the duration of Mr. Brin's

4    detention, the court declines to grant summary judgment with respect to Mr. Brin's false

5    imprisonment claim. *See Loharsingh*, 696 F. Supp. 2d at 1096 (reaching the same

6    conclusion); *cf. Oviatt By & Through Waugh v. Pearce*, 954 F.2d 1470, 1479 (9th Cir.

7    1992) (discussing an Oregon case holding that summary judgment on plaintiff's false

8    imprisonment claim was inappropriate because a reasonable jury could conclude that

9    plaintiff's detainment became unlawful once suspicion dissipated).[17]

10    In light of the foregoing, Mr. Brin's summary judgment motion is denied with

11    respect to all remaining claims: (1) Fourth Amendment unlawful detention, (2) Fourth

12    Amendment unlawful search, and (3) false imprisonment.

13    **D.    Defendants' Summary Judgment Motion**

14    The court independently considers the merits of Defendants' summary judgment

15    motion. *ACLU*, 333 F.3d 1092 at 1097. Defendants' motion is nearly identical to their

16    response to Mr. Brin's motion for summary judgment (*see* Defs. Resp. at 3-14; Defs.

17    MSJ at 2-12), and Mr. Brin's response to Defendants' motion does not substantively

18    differ from his own motion for summary judgment (*see* Brin Resp.; Brin MSJ.) The

19

20

21    [17] In both their response to Mr. Brin's summary judgment motion and in their own summary judgment motion, Defendants argue that Mr. Brin's claims against Officer Jordal should be dismissed. The court addresses these arguments in its analysis of Defendants' motion

22    for summary judgment.

1    court therefore incorporates its discussion of the above legal principles and the parties'

2    factual disputes into its assessment of Defendants' summary judgment motion.

3        1.  Fourth Amendment Unlawful Detention

4        Defendants argue, and Mr. Brin disputes, that they are entitled to judgment as a

5    matter of law on Mr. Brin's Fourth Amendment unlawful detention claim because his

6    detention was supported by the requisite reasonable suspicion or probable cause.  (Defs.

7    MSJ at 5-6, 8-9; Brin Resp. at 5-8, 10.)  As explained above, no reasonable jury could

8    find that Defendants lacked reasonable suspicion to initially detain Mr. Brin to conduct

9    an investigatory stop.  Consequently, Defendants are entitled to summary judgment with

10   respect to Mr. Brin's Fourth Amendment unlawful detention claim to the extent it is

11   based on Defendants' initial decision to detain Mr. Brin to conduct an investigatory stop.

12       As stated, however, there are disputes of material fact bearing on whether Mr.

13   Brin's detention remained an investigatory stop or amounted to an arrest.  (*See* Defs. MSJ

14   at 5-9; Brin Resp. at 5-10.)  In viewing the evidence in the light most favorable to Mr.

15   Brin, a reasonable jury could find that he was not sufficiently uncooperative and that

16   placing him in handcuffs transformed the investigatory stop into a *de facto* arrest

17   requiring probable cause.  *See Sialoi*, 823 F.3d at 1233-34 (concluding that the plaintiff's

18   detention amounted to an arrest when he "raise[d] his voice" and "initially refused to

19   raise his hands" but "calmed down in a matter of minutes and complied with the officer's

20   requests").  Furthermore, there are disputes of fact regarding when Defendants learned

21   that Mr. Dykstra modified his description of the Nissan driver.

22

1    In light of these disputes of fact, the court also cannot determine as a matter of law

2    whether Mr. Brin's detention was unlawfully prolonged. *Cf. Rayzberg*, 2024 WL

3    3055474, at *5 (finding that a reasonable jury could conclude that the defendants

4    unlawfully continued the plaintiff's detention without reasonable suspicion); *Sialoi*, 823

5    F.3d at 1232 ("continuation of [an] arrest [without probable cause] is illegal").

6    Accordingly, the court denies Defendants' motion with respect to Mr. Brin's

7    Fourth Amendment unlawful detention claim to the extent it is based on the duration of

8    his detention.

9    2. Fourth Amendment Unlawful Search

10    Defendants' summary judgment motion, like Mr. Brin's motion, contains little

11    description or argument regarding their search of Mr. Brin. (*See* Defs. MSJ at 5-9.) In

12    light of the factual disputes explained above, and given the limited evidence regarding

13    Defendants' search of Mr. Brin, the court denies Defendants' summary judgment motion

14    with respect to Mr. Brin's Fourth Amendment unlawful search claim.

15    3. False Imprisonment

16    Defendants also assert that they are entitled to summary judgment with respect to

17    Mr. Brin's false imprisonment claim because they had reasonable suspicion and probable

18    cause to detain him. (Defs. MSJ at 10-11.) Given the identified disputes of fact

19    regarding whether Mr. Brin's detention amounted to an arrest and whether the duration of

20    his detention was unlawfully prolonged, the court denies Defendants' summary judgment

21    motion with respect to this claim.

22

1          4.  Mr. Brin's Claims Against Officer Jordal

2          Defendants assert that Mr. Brin failed to produce admissible evidence supporting

3    his claims against Officer Jordal.  (*See* Defs. MSJ at 2.)  It is undisputed that Officer

4    Jordal was dispatched to and present at the scene of Mr. Brin's detention.  (*See* 6/10/25

5    Brin Decl., Ex. E (Dkt. 35-3) at 8 (Officer Jordal identified as radio number K915); *id.* at

6    1-8 (showing Officer Jordal was dispatched to the scene of the hit-and-run collision).)

7    Mr. Brin, however, cites no evidence supporting his assertion that Officer Jordal was a

8    participant in, much less a "central figure" to, Mr. Brin's detention.  (*See generally* Brin

9    Resp.; *see also* Brin MSJ at 6.).  Because Mr. Brin has not met his burden at summary

10   judgment to identify specific facts from which a factfinder could reasonably find in his

11   favor, *Celotex, 477 U.S.* at 324, the court grants Defendants' motion with respect to Mr.

12   Brin's claims against Officer Jordal.

13              **IV.    CONCLUSION**

14         For the foregoing reasons, Mr. Brin's motion for summary judgment is DENIED

15   (Dkt. # 29), and Defendants' motion for summary judgment is GRANTED in part and

16   DENIED in part (Dkt. # 48).  Specifically, Defendants' motion is GRANTED with

17   respect to (1) Mr. Brin's Fourth Amendment unlawful detention claim to the extent it is

18   based on Defendants' initial decision to detain Mr. Brin to conduct an investigatory stop

19   and (2) all of Mr. Brin's claims against Officer Jordal.  Defendants' motion is DENIED

20   with respect to Mr. Brin's Fourth Amendment unlawful search and false imprisonment

21   claims.  Accordingly, this matter will proceed to trial on Mr. Brin's claims for Fourth

22

Amendment unlawful detention; Fourth Amendment unlawful search, and false

imprisonment against Defendants Joshua Hartwick, Felicia Espana, and Keith Polzin.

Dated this 16th day of September, 2025.

JAMES L. ROBART
United States District Judge